UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        Plaintiff,<br>   v.<br><br>MAURICE STOKES,<br><br>                        Defendant. | Case No. 2:13-cr-00217-JAD-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Suppress – Dkt. #62) |

Before the court is Defendant Maurice Stokes' ("Stokes") Motion to Suppress Evidence (Dkt. #62) which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. The court has considered the Motion, the United States' Opposition (Dkt. #63), Stokes' Reply (Dkt. #64), and evidence adduced at an evidentiary hearing conducted August 27, 2014. Michael Miceli appeared on behalf of the Defendant, and Susan Cushman appeared on behalf of the government.

## BACKGROUND

Stokes is charged in an Indictment (Dkt. #1) returned June 11, 2013, with conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846 and 841(a)(1), and three counts of distribution of a controlled substance and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2. The charges arise out of a May 20, 2013 arrest at the Stratosphere Hotel & Casino in Las Vegas, Nevada, following an undercover investigation conducted by a state/federal task force consisting of Henderson Police Department officers, Drug Enforcement Agency ("DEA"), and Homeland Security agents.

Co-Defendant Thomas Kenniston ("Kenniston") was initially arrested on May 20, 2013, following two hand-to-hand sales to an undercover officer in April 2013, and a third sale on May 20, 2013. At the time of his arrest, Kenniston received several text messages on his phone from

1

1 a contact listed as "Connects" and implicated Stokes as his "connect," *i.e.,* source of supply. Kenniston cooperated with the officers and made arrangements to meet Stokes at his hotel room at the Stratosphere in Las Vegas. Stokes was arrested in the lobby of the Stratosphere. He was later questioned and reportedly admitted his involvement in the sale of ecstacy.

**I.     The Motion to Suppress**.

The motion to suppress contends that officers made a warrantless, non-emergency entry into his hotel room and conducted a search in violation of the Fourth Amendment. An incident report authored by Henderson Police Department Officer Rand Allison indicates that he obtained a state search warrant at approximately 9:00 p.m., on May 20, 2013. The application for the telephonic search warrant indicated it was applied for at 8:35 p.m. However, hotel surveillance video obtained from the Stratosphere indicates the officers entered the room at 7:57 p.m., more than a half hour before Officer Allison applied for the telephonic search warrant. Stokes argues it is clear from this timeline that any evidence obtained through a search of the room was an illegal search and seizure, and any evidence derived from the search should be suppressed.

Stokes also maintains that officers illegally searched his cell phone without a warrant in violation of the Supreme Court's recent decision in *Riley v. California*, ___ U.S. ___ 134 S.Ct. 2473 (2014). The reports indicate that Officer Allison took custody of Stokes' cell phones and waited for the search warrant to search them. However, Stokes maintains this is not what actually happened, and that the officers immediately began searching his phones for text messages that had been sent by co-Defendant Kenniston's cell phone under the name Connects. There were no exigent circumstances to allow for a search of the cell phones without a warrant. The officers had the cell phones in their custody and therefore, there was no danger of imminent destruction of evidence. Stokes was in handcuffs and under law enforcement control and was therefore no flight risk. Stokes acknowledges that *Riley* was decided after Stokes' arrest, but contends that its ruling should apply to the search of Stokes' cell phones in this case and any evidence derived from the cell phone should be excluded.

Stokes also argues that any statements he made should be suppressed because he did not receive and waive *Miranda* warnings. Additionally, Stokes argues that he invoked his right to

have counsel present during his interrogation, but the officers nevertheless interrogated him in violation of his Fifth, Sixth, and Fourteenth Amendment rights.

**II.     The Government's Response**.

The government opposes the motion asserting that on May 20, 2013, after Kenniston sold 4,000 MDMA (ecstacy) pills to an undercover officer for $10,800 at Steiner's Bar & Grill, Kenniston identified Stokes as a source of supply. Kenniston told officers that he was supposed to bring the proceeds from the sale to Stokes at the Stratosphere. While speaking with officers, Kenniston received calls and text messages on his cell phone from "Connects" which Kenniston stated was Stokes. Kenniston agreed to place a call to Stokes in the presence of Detective Allison and Department of Homeland Security ("DHS") Special Agent Samuel Smith. Kenniston called Stokes and made arrangements to meet him at the Stratosphere.

At approximately 6:16 p.m., the government contends law enforcement officers saw Stokes leave Room 22132 at the Stratosphere and walk towards the elevators to go to the lobby where he was detained. Detective Allison instructed officers to conduct a protective sweep of Room 22132 and freeze it pending the approval of a state telephonic search warrant. At 8:55 p.m., Detective Allison obtained a state telephonic search warrant from Henderson Judge David S. Gibson, Sr., which authorized the search of Stokes' hotel room. The application and affidavit supporting the search warrant establish Judge Gibson had a substantial basis for concluding probable cause existed for the search of the room. Officer recovered three MDMA pills stamped with a dragonfly from inside Stokes' gym bag, and room receipts for the room in Stokes' name. An iPhone 5 with cellular number (323) 445-9169, and a Motorola cell phone were recovered from Stokes' person.

The government claims that Stokes was advised of *Miranda* warnings by DHS Special Agent Smith and Henderson Police Department Detective Lori Bryant at approximately 7:40 p.m., as he was being transported to the Henderson Detention Center. According to the government, Stokes indicated he understood his rights and gave a voluntary statement admitting to being involved in Kenniston's April 15, 2013 sale to an undercover officer. Stokes also stated he introduced Kenniston to "Bump" who was supplying Kenniston. Stokes reportedly admitted

1 that the $4,000 he was collecting from Kenniston was his cut of prior transactions. The
2 government claims that Stokes only asked for an attorney when Special Agent Smith began to
3 ask for more specific details and that the interview was immediately ended when Stokes invoked
4 his right to counsel.

On May 28, 2014, Judge Gibson signed a second search warrant authorizing a search of
6 Stokes' phones. On the iPhone were numerous text messages between Kenniston and Stokes
7 discussing the drug sales charged in the indictment and numerous photographs of ecstacy pills
8 similar in appearance to those that the undercover officer purchased from Kenniston.

9 **III.    Stokes' Reply**.

10 Stokes' reply reiterates arguments that the officers searched his hotel room before
11 obtaining the state telephonic search warrant almost an hour after they entered the room, and that
12 officers searched Stokes' cell phone without a warrant, did not properly *Mirandize* him, or cease
13 questioning when he invoked his right to have counsel present.

14 **DISCUSSION**

15 The Fourth Amendment secures "the right of the people to be secure in their persons,
16 houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV.
17 The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v.*
18 *United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id*.
19 Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be
20 suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

21 **I.    Testimony at the Evidentiary Hearing**.

22 The government called Henderson Police Department Detective Rand Allison and
23 Department of Homeland Security Special Agent Samuel Smith to testify. Stokes testified and
24 counsel for Stokes introduced a disk of video surveillance taken from multiple cameras inside
25 and outside the Stratosphere Hotel on the date of Stokes' arrest.

26     **A.    Detective Rand Allison**.

27 Detective Allison has been a police officer of the Henderson Police Department for
28 fifteen years and is currently assigned to the Southern Nevada Money Laundering Task Force.

1  Prior to that, he was involved in narcotics enforcement.  He was involved in the investigation in
2  this case as part of a state and federal task force and was the primary officer on the state side of
3  the investigation.  On May 20, 2013, co-Defendant Thomas Kenniston was arrested following a
4  hand-to-hand sale to an undercover officer and identified Stokes as his connection, or source of
5  supply.  After Kenniston was arrested his cell phone kept buzzing and getting incoming texts
6  asking "we good" from a phone number identified as "Connects."  Kenniston was very
7  cooperative and indicated that Maurice was Connects and trying to call him.  Kenniston told
8  officers Stokes was at the Stratosphere and expecting Kenniston to pay him money for the deal.
9  Allison had Kenniston place a phone call to Stokes indicating he was on the way to the
10 Stratosphere.

11     Allison got a DEA team to go to the Stratosphere to set up and once they were in place,
12 had Kenniston call Stokes saying he was downstairs, could not get up to Stokes' room without a
13 key, and asked if Stokes would come down to meet him in the lobby.  Stokes was in room 22132
14 and agreed to come to the lobby.  The DEA team had set up an observation room on the same
15 floor where they had sight of Stokes' room.  The DEA team stopped Stokes at the elevators on
16 the bottom floor in the lobby area of the Stratosphere at approximately 6:16 p.m.

17     DEA team members informed Allison that Stokes was overwhelmed, experiencing
18 anxiety, was diabetic and having a medical issue.  The fire department was called to check him
19 out.  The DEA team conducted a protective sweep of Stokes' room and found Anthony Harding
20 inside.  Harding had a non-extraditable robbery warrant out of California.

21     Allison was not at the Stratosphere during the protective sweep and went to the north
22 substation where he began preparing a telephonic search warrant.  The telephonic search warrant
23 was approved by Judge Gibson at approximately 8:55 or 9:00 p.m.  The DEA team was advised
24 when the search warrant was obtained and began the room search.  Three tabs of ecstacy were
25 recovered in a night bag and were the same size and shape, and had the same dragonfly imprint
26 as the ecstacy that was sold to the undercover officer.  Paperwork indicating Stokes rented the
27 room was also recovered.
28

Allison asked the DEA team to recover the phones found on Stokes' person for evidence. He believed an iPhone and Motorola cell phone were recovered from Stokes by Officer Jordan who gave the phones to Sergeant Guerra who gave them to Allison. Allison did not recall if the phones were on or off at the time he received them. However, he immediately took the battery out has he has been trained because phones can be remotely wiped. He put the phones in evidence and applied for a search warrant for the phones. Judge Gibson issued the search warrant May 29, 2013. The phones were transferred to DEA analyst, Fred McGowan, who recovered digital data from the iPhone contacts, text messages and photos. The search warrant also authorized a search of Kenniston's phone.

On cross-examination, Allison testified that he did not go to the Stratosphere on May 20, 2013, but was aware surveillance video had been obtained by agents at the scene. The disc containing the surveillance videos was marked and admitted as Defense Exhibit "1". Allison identified the four members of the DEA team who went to set up an observation room on the same floor where Stokes was staying at the Stratosphere. The observation or surveillance room was several doors down from Stokes' room. At approximately 6:17 p.m., Stokes was observed coming out of his hotel room with four agents following him to the elevator. The officers made contact with Stokes, appeared to identify themselves, and cuffed Stokes when he reached the lobby at approximately 6:19 p.m. Allison did not know what the officers said to Stokes or whether any of the officers gave him *Miranda* warnings. Stokes had two phones on him which were retrieved. Allison was told the phones were not searched, but Allison has no personal knowledge.

From reviewing the video surveillance played in open court, it appeared that officers knocked on Stokes' hotel room at approximately 6:35 p.m., and pulled a gentleman out of the room. Allison believed this was Hardy. Hardy was placed in handcuffs and taken into the surveillance room. The room was frozen while the search warrant was obtained. Allison acknowledged that the video surveillance tape played in court depicts officers leaving the surveillance room at approximately 7:57 p.m. with Hardy and the officers are observed using a key to enter Stokes' room with Hardy. Several minutes later the officers and Hardy leave the

room with Hardy wearing his jacket and the officer carrying a backpack and box containing Hardy's possessions. It appears the officers and Hardy were in the room approximately three to four minutes.

Allison ordered the room frozen, and the affidavit supporting the search warrant told Judge Gibson the room had been frozen. At the time he applied for the search warrant, he was not aware that detectives had allowed Hardy to go into the room to retrieve his belongings.

Stokes was taken to the Henderson Detention Center after he was taken to the DEA office. Allison was not present in the car when Stokes gave a statement.

On redirect, Allison testified that Hardy was released because the robbery warrant was non-extraditable. He believed that the officers at the Stratosphere went into the room to retrieve Hardy's belongings because they were not items that would be used as evidence in this case. Allison was told a protective sweep was conducted to find a person in Stokes' room. He spoke with a supervisor and was told that the room was "absolutely not" searched before the search warrant. On re-cross, he was asked why multiple officers would enter Stokes' room when it was supposed to be frozen awaiting a search warrant. He testified that multiple officers may have entered the room, both to control Hardy and to serve as witnesses that Hardy retrieved only his personal belongings.

**B.   Special Agent Samuel Smith.**

Smith has been a special agent for the U.S. Department of Homeland Security for a little over seven years and is currently assigned to human trafficking and intellectual property violations. He was previously a member of the Henderson Heroin Task Force and was involved in the investigation resulting in Stokes' arrest. His initial job was to be part of the arrest team at the scene of the drug buy.

On May 20, 2013, he helped transport Stokes to the Henderson Detention Center. He first saw Stokes at the DEA office where they release prisoners in the back. He transported Stokes in an HPD van after DEA agents brought him down. He and Henderson Detective Lori Bryant did a quick pat down search. Smith advised Stokes of his *Miranda* rights approximately three to five minutes after Stokes was put in the van en route to the Henderson Detention Center.

7

Government's Exhibit "1" is a statement of rights form issued by the Department of Homeland Security which he used to read Stokes' *Miranda* rights to him. Smith read the entire form to Stokes, but did not have Stokes initial the form acknowledging receipt and waiver of his rights because Stokes was in cuffs. Smith asked Stokes if he understood his rights and Stokes said he did. Stokes appeared to be healthy and normal. Stokes did not complain about feeling light-headed or having a heart attack. Stokes indicated he understood his rights and wanted to talk to Smith.

Smith first asked if he understood why he was under arrest. Stokes responded that he thought it was something to do with drugs. Smith responded that it was way more serious—that he was accused of dealing drugs. Stokes responded that he worked, but on the side he introduced people to others to do connections. He knew Tommy [Kenniston] was dealing drugs. Stokes introduced Tommy to Bump, an ecstacy supplier. Stokes admitted that he had collected money because of deals that Kenniston did. Specifically, he acknowledged receiving $400 for the April 2013 sale, and indicated he was supposed to get $4,000 for the May 20, 2013 sale. Stokes stated that Tommy was a drug user and that Stokes did not want him gambling and spending all of the money from the sale, so he came to Las Vegas to collect his money.

Smith testified that he did not make any promises or threats to Stokes while questioning him. The drive to the Henderson Detention Center took approximately twenty to twenty-five minutes. When they arrived at the Henderson Detention Center, he asked the officers for an interview room. He, Bryant and Stokes went into the interview room, and Smith asked Stokes if he needed anything. Stokes was unhandcuffed and asked to speak with his mother. Bryant told Stokes that they needed to finish talking with him and get more details. Stokes said that he introduced Tommy to Bump, the ecstacy supplier. He repeated that he knew Tommy dealt ecstacy and got $2/pill. Stokes admitted he got $400 from Tommy and that he met Tommy on the highway in Ontario as he was coming back from Las Vegas. Stokes stated that the drug deals "were on Tommy" because Stokes didn't touch the drugs. Stokes also stated that he'd only get five years with a good lawyer and that "federal time is not that bad." Bryant asked Stokes who his supplier was and Smith also asked a follow-up question. At this point, Stokes said he wanted

8

a lawyer and the officers immediately stopped the interview.  Stokes was escorted to the area where he was processed for booking and no additional questions were asked.

On cross-examination, Smith testified he took custody of Stokes around 7:35 p.m., and was not present inside the Stratosphere for the initial arrest.  He was not aware whether Stokes told other officers at the scene that he wanted a lawyer.  He did not know whether or not officers at the scene began looking through Stokes' phone.

He reiterated that he read *Miranda* warnings to Stokes en route to the detention center from the form marked as Government's Exhibit "1."  He did not have Stokes fill out the bottom portion of the form.  Smith knew they were headed to the detention center and would have an interview room where the form could be signed.  Detective Bryant witnessed *Miranda* warnings.  At the interview room in the Henderson Detention Center, Stokes was uncuffed, but Smith did not have him sign the *Miranda* waiver form.  Smith did not record Stokes' statement, did not have a recording device, and does not record interviews except when acting undercover.

Smith went to the Stratosphere after he and other officers left the scene of the last drug buy at Steiners.  He was with Detective Allison when Kenniston was arrested.  The sergeant in charge directed Smith and another detective to go to the DEA to pick up Stokes.  Smith drove his vehicle to the Homeland Security office and was picked up by Bryant who took him to DEA to pick up Stokes.

C.      **Testimony of Maurice Stokes**.

On May 20, 2013, Stokes was at the Stratosphere Hotel in Las Vegas.  He was arrested that evening.  From seeing the video in court, he knew that he was arrested around 6:16 or 6:17 p.m.  He was handcuffed and searched.  The officers recovered an iPhone from his left pants pocket.  He also had a Motorola prepaid phone on him which the officers took.  The officers looked at his iPhone and opened it commenting there was no lock on it.  The officers scrolled through his iPhone looking at text messages and looked at the number for Tommy Guns [Kenniston].  The officers commented "oh yeah, he is definitely the one who texted Tommy Guns."  Tommy Guns is the nickname for Kenniston.

One of the officers asked him if he knew why he was being arrested. Stokes responded he did not. Stokes testified that none of the officers who arrested him read *Miranda* warnings to him. Stokes responded that he thought he was maybe being arrested because of a probation violation. One of the officers told him "no, it's bigger than that, we got your buddy." Stokes testified he responded that he did not know what the officer meant, and that he needed to speak to a lawyer. The officer responded, "we'll get to that." Another officer commented that he was sweating and asked if he was okay. Stokes said he was hot and experiencing some anxiety. One of the officers made a comment about "you California guys" coming to Las Vegas and getting in trouble. The paramedics arrived and attended to him.

Special Agent Smith walked Stokes from the Stratosphere and put him into a van and took him to an office where he could use the bathroom. Smith asked him if he knew why he was there. Stokes responded that he thought it had something to do with his probation. Stokes denied that Smith read him any *Miranda* rights. He was eventually taken to an interview room and told to sit down. He was uncuffed, but no one read any *Miranda* warnings to him. Stokes testified he reiterated that he wanted to talk to a lawyer. Smith responded "let me read you these rights first."

On cross-examination, Stokes testified that he had been convicted of robbery and was currently on parole. He was not aware whether Hardy had a record or was on parole. Stokes did not have permission to be in Las Vegas. Stokes also had a juvenile conviction for burglary. He met Tommy Guns through someone else two or three years prior through a friend at a house party. He heard Special Agent Smith testify to a conversation with him. Stokes testified that Smith's version of the conversation "was not the actual conversation." Stokes denied that he told Special Agent Smith he was in Las Vegas to pick up $4,000 from Tommy or that he had met Tommy Guns in Ontario. He told Smith he wanted an attorney. While he was in the van en route to Henderson, he told Smith he did not know why he was arrested. Smith told him it was a much bigger problem than a probation violation and they no longer spoke at all during the drive.

At the Stratosphere when he was arrested, officers scrolled through his phones making several comments about the texts. In viewing the video surveillance in court, he noticed that the

officers surrounded him and took the phone out of his pocket. One of the officers commented "oh yeah, this is definitely the phone" connected to this deal. One of the officers was scrolling through his iPhone and showing the content to other officers.

The fire department paramedics arrived minutes later. He wasn't feeling sick, but it was hot and they were crowding around him and he "had a certain level of anxiety." The officers commented about the contacts on his phone and referred to Tommy G who is Tommy Kenniston and commented that it was his number on Stokes' phone connected to Tommy. There is an icon on his iPhone next to his messages. After the officers entered his text messages, they clicked on his photos commenting "you got a lot of photos." They were going through his phone showing each other the contents. He hadn't seen any of them display their badges and asked who they were. One of the officers pulled out his badge for the first time and this is when Stokes said for the first time that he needed to see a lawyer.

### D.     Review of Surveillance.

After the evidentiary hearing the court reviewed the video footage disc marked and admitted as Defense Exhibit "1" in its entirety and had a question about whether Agent Smith was the person depicted in a portion of the footage. The court met briefly in chambers to review the footage with counsel for both sides on September 18, 2014, with Special Agent Smith present. Reviewing the footage with counsel for both sides with Agent Smith present, the court is satisfied that Smith is not the person in the footage present shortly after Stokes' arrest or the individual who walked Stokes outside the Stratosphere with two DEA officers. Mr. Miceli affirmed that he did not claim that Smith was in this footage and thus had not raised this issue at the evidentiary hearing. The court offered to reopen the evidentiary hearing for the limited purpose of having Agent Smith testify he was not the person in the footage, but counsel for Stokes indicated this was not necessary.

## II.    Applicable Law and Analysis.

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v.*

*United States*, 389 U.S. 347 (1967).  The Fourth Amendment protects "people, not places."  *Id*.  Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963)**.**

### A. Search of Stokes' Hotel Room.

The Supreme Court has repeatedly held that the touchstone of the Fourth Amendment is reasonableness.  *Brigham City v. Stuart*, 547 U.S. 397, 403 (2006).  When law enforcement search to discover evidence of criminal wrongdoing, reasonableness generally requires a search warrant.  *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  In the absence of a search warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.  *Riley v. California,* 134 S.Ct. 2473, 2482 (2014).

To contest a search, a Defendant must establish a legitimate expectation of privacy in the place searched.  *See United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).  The Fourth Amendment protection against unreasonable searches and seizures extends to hotel or motel rooms.  *Id.*  Unless the rental has expired when the search is conducted, an occupant of a hotel or motel room has a reasonable expectation of privacy in the room. *Id.*

The government does not contend that Stokes lacks standing to challenge a search of his hotel room.  Rather, the government argues the search was conducted pursuant to a valid search warrant issued by Judge Gibson.  Stokes does not challenge the validity of the search warrant that officers obtained authorizing the search of his room.  Rather, based on the video surveillance that was produced in discovery in this case, he argues officers searched his room before the warrant was obtained.

It is undisputed that members of the DEA team who conducted surveillance and arrested Stokes at the Stratosphere entered Stokes' room after his arrest and before the search warrant was obtained.  The first entry was made to conduct a protective sweep and "freeze" the premises awaiting the search warrant.  The video surveillance camera footage shows officers entered the room at approximately 6:35 p.m.  The protective sweep reveal that another male, Thomas Hardy, was in the room.  The officers removed Hardy closing the door to Stokes' room a few minutes after the initial entry.  The video surveillance tape also shows several DEA officers reentering

the room using a key at approximately 7:57 p.m.—almost an hour before Judge Gibson issued the search warrant. The officers entered the room with Hardy and remained in the room for less than four minutes. The video shows the officers leaving the room with Hardy in possession of his jacket and the officers carrying a backpack and a box containing Hardy's possessions.

Detective Allison testified that the room was not searched until the warrant was obtained, although he lacked personal knowledge of what occurred at the Stratosphere on the date of Stokes' arrest. It is uncontroverted that Hardy was found in the room and a records check indicated he had an outstanding robbery warrant which was non-extraditable. The videotape confirms that the officers entered the room at 6:35 p.m., and left shortly thereafter with Hardy in tow. The officers reentered the room at 7:57 allowing Hardy to retrieve his belongings. However, there is no evidence in the record to support Stokes' speculation that the officers conducted a search of the room before the search warrant was obtained. Additionally, the search warrant application and affidavit does not rely on any information learned from entering the room to support probable cause for the warrant.

The evidence from Stokes' hotel room was recovered pursuant to a valid search warrant. The search warrant application was not tainted by any evidence derived from the two prior entries into Stokes' hotel room. The Supreme Court has held that when officers have probable cause to arrest an occupant of a premises, they may enter the premises and secure it to preserve the status quo while obtaining a warrant. *Segura v. United States,* 468 U.S. 796, 798 (1984). It is also well established that evidence observed during a prior illegal entry of a premises need not be suppressed where officers obtain a valid search warrant that does not rely on anything seen or discovered during the prior illegal entry. *Murray v. United States,* 487 U.S. 534, 543 (1988).

Stokes' motion speculates that officers searched the room during the initial entry which found and removed Hardy and/or during the second entry in which Hardy was allowed to retrieve his belongings. Both entries were brief. Nothing the officers saw or discovered during either entry was used to support the search warrant. Thus, even if either of the entries was illegal, the evidence recovered from Stokes' hotel room was recovered pursuant to a valid warrant and suppression is not required. The court finds that Stokes' Fourth Amendment rights

were not violated by the officers' brief entries into the room to conduct a protective sweep, or to allow Hardy to retrieve his personal belongings.

### B. Search of Stokes' Cell Phones.

Stokes also seeks to suppress the contents of his iPhone and Motorola pre-paid cell phone taken from his person incident to his arrest. His written motion and testimony claim that the officers who arrested him seized both phones and scrolled through them without a warrant. The United States acknowledges that the Supreme Court's recent decision in *Riley v. California* requires a search warrant to search the contents of cell phones. However, the government's written response to the motion attaches a copy of the May 28, 2013 search warrant authorizing a search of Stokes' cell phones, and the cell phone of co-Defendant Kenniston. Stokes does not claim that the search warrant lacked probable cause for the search of his phones, or that the search warrant is invalid for any other reason.

It is undisputed that Stokes' two cell phones were recovered from his person incident to his arrest on May 20, 2013. In *Riley v. California*, the Supreme Court recently decided whether the police may search digital information on a cell phone incident to arrest. Balancing the degree of intrusion of an individual's privacy against the competing need to promote legitimate governmental interests, the Supreme Court concluded a warrant is required. 134 S.Ct. 2473, 2485. *Riley* examined the underpinnings of the search incident to arrest doctrine beginning with C*himel v. California*, 395 U.S. 752 (1969). In C*himel*, the court held that when police have probable cause to arrest a suspect, the risk of harm to officers and risk of possible destruction of evidence makes it reasonable under the Fourth Amendment to conduct a search incident to arrest. *Id.* at 762-63. The *Riley* decision also relied on the holding in *United States v. Robinson*, 414 U.S. 218, 235 (1973) that as long as an arrest is lawful, a search incident to arrest requires no additional justification.

However, *Riley* found that the twin rationales for the search incident to arrest doctrine did not apply to the contents of digital data found on a cell phone which is a mini computer that contains vast amounts of personal information. *Id. Riley* held that officers may examine the

14

1  physical aspects of the cell phone to ensure that it will not be used as a weapon and may seize a
2  cell phone to prevent destruction of evidence before seeking a warrant. *Id.* at 2485.

3  Stokes' uncontradicted testimony was that the officers who arrested him scrolled through
4  his iPhone commenting that they had the right guy, that his iPhone contained a number linking
5  him to Kenniston identifying him as "Connects," and that he had a lot of photos on his phone.
6  None of the officers involved in the arrest testified. The court found Stokes' testimony credible
7  that the officers scrolled through his iPhone looking at his text messages and commenting about
8  the contents of the messages that linked him to Kenniston, the text messages exchanged that day,
9  and the number for Connects. It is undisputed that Stokes' phones were seized from his person
10 incident to his arrest. It is undisputed that the search warrant issued by Judge Gibson on May 20,
11 2014, also authorized the seizure of Stokes' cell phones. Finally, it is undisputed that Allison la
12 obtained a search warrant to search the contents of Stokes' phones May 28, 2014.

13 Stokes does not claim that either of the search warrants lacked probable cause or are
14 invalid for any other reason. The court has reviewed the second search warrant for the contents
15 of his phones which is attached as Exhibit "2" to the government's response. The application for
16 the search warrant does not rely upon any information learned from the contents of Stokes'
17 phones to support probable cause for the search warrant. For the reasons explained in the
18 preceding section, the court finds that suppression of evidence derived from DEA Analyst Fred
19 McGowan's review of the digital data on Stokes' cell phone should not be suppressed.
20 McGowan searched the digital data on the phone pursuant to a valid search warrant. Thus, even
21 if the DEA agents who arrested Stokes scrolled through the contents of the phone, *Segura* and
22 *Murray* hold that evidence obtained through a valid search warrant that does not rely upon any
23 evidence derived form an unlawful search should not be suppressed.

24 **C.    Stokes' Statements.**

25 The government has the burden of proving, by a preponderance of the evidence, whether
26 a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The government must
27 also establish, by a preponderance of the evidence, the Defendant waived his protection under
28 self-incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

In *Miranda v. Arizona*, the Supreme Court held that when a suspect in law enforcement custody invokes his right to counsel, all interrogation must stop until the subject has an attorney present and an opportunity to consult with the attorney. 384 U.S. 436, 474 (1966). The *Miranda* Court also held that after invoking the right to counsel, a suspect is entitled to have an attorney present during any further interrogation. *Id*. In *Edwards v. Arizona*, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. 477, 485 (1981). *Edwards* also held that after a suspect has invoked the right to counsel, law enforcement may not interrogate the suspect further until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*.

In *Edwards*, the defendant was arrested on charges of robbery, burglary, and first-degree murder. *Id*. at 478. Law enforcement read him his *Miranda* rights, and he agreed to submit to questioning. *Id*. After he was informed that another suspect in custody had implicated him in the crimes, he gave a taped statement presenting his alibi defense. *Id*. at 479. He then informed police he wanted to "make a deal," and the interrogating officer told him he did not have authority to do it and called the county attorney, who spoke with Edwards. *Id*. After the phone call, Edwards invoked his right to counsel. *Id*. at 479. The next morning, two detectives who were colleagues of the officer who interrogated Edwards the previous evening, visited Edwards in jail. *Id*. The detention officer told Edwards he had to speak with them, and after the detectives mirandized him, Edwards agreed to talk if the detectives played the taped statement of the person who had incriminated him. *Id*. After listening to the statement for a few minutes, Edwards confessed in an untaped interrogation. *Id*.

Stokes testified that he was asked by one of the DEA officers who initially arrested him whether he knew why he was in custody. Stokes testified he responded that he thought he was maybe being arrested because of a probation violation. Stokes stated that he was told that it was "bigger than that, we got your buddy," and that he (Stokes) responded that he didn't know what

16

the officer meant and needed to speak to a lawyer. None of the members of the DEA team who were involved in Stokes' arrest testified at the evidentiary hearing. Stokes' testimony is uncontradicted that he asked for a lawyer and was told, "we'll get to that." The court found Stokes credible in this regard.

Special Agent Smith testified that he read Stokes *Miranda* warnings in the van on the way to the Henderson Detention Center, and that Stokes indicated he understood his rights and was willing to speak. Smith also testified that he read Stokes his rights from a standard form issued by the Department of Homeland Security. Smith stated he did not ask Stokes to sign the form because he was in handcuffs and knew there would be an interview room at the Henderson Detention Center where Stokes could sign the form. However, it is undisputed that Stokes did not sign the form after he arrived at the detention center, was placed into an interview room, and uncuffed. Smith testified that Stokes initially answered questions, but invoked his right to counsel when he and Detective Bryant asked more specific follow-up questions. The court found Special Agent Smith credible that he and Bryant ceased all questioning once Stokes invoked his right to counsel in their contact with him. However, as the court has also found Stokes credible that he asked for a lawyer shortly after his initial arrest, his statements must be suppressed.

*Edwards* held that once an accused invokes his right to counsel, he cannot waive that right by simply responding to further police-initiated custodial interrogation, even if he has been mirandized. *Id*. at 484-85. Additionally, the Supreme Court held that law enforcement may not question the suspect until counsel has been made available, unless the accused himself initiates the further communications, exchanges, or conversations with the police. *Id*. at 485. The Supreme Court emphasized that it is inconsistent with *Miranda* for law enforcement to re-interrogate an accused in custody if he has clearly asserted his right to counsel. *Id*. Statements an accused makes after invoking the right to counsel are only admissible in a prosecution against him if the accused (a) initiated further discussions with police; and (b) knowingly and intelligently waived the right he invoked. *Id*. at 485, 486, n.9. The government does not claim that Stokes initiated discussions with Smith and Bryant and it is clear from his own testimony

that Smith initiated the custodial interrogation. The court finds the government has not met its burden of establishing that Stokes knowingly and intelligently waived the right to counsel that he invoked before Smith initiated questioning.

In cases decided after *Edwards*, the Supreme Court has reinforced the rule that police-initiated interrogation is prohibited unless the accused has counsel with him at the time of questioning and has classified the Edwards rule as "rigid" and "prophylactic." *Id*. at 153; *see also Smith v. Illinois*, 469 U.S. 91, 95 (1984). In *Arizona v. Robertson*, the Supreme Court reiterated that *Edwards* provides "clear and unequivocal guidelines to the law enforcement profession." 486 U.S. 675, 682 (1988). The Supreme Court held that a suspect who invokes his right to counsel is also protected from subsequent questioning about another unrelated offense. *Id.* at 683. There, the suspect was arrested on suspicion of burglary and requested an attorney before questioning. *Id*. at 678. Three days later, while still in custody, different officers mirandized and interrogated the suspect and secured an inculpatory statement about a second, unrelated offense. *Id*. The Ninth Circuit has applied these cases stating, "The rule emerging from *Robertson* is that whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, police have an obligation to provide counsel once it is requested by a suspect." *United States v. Lucas*, 963 F.3d 243, 246 (9th Cir. 1992).

In *Lucas*, the defendant was in custody on a suspected auto theft. *Id*. at 244. Police entered his cell, mirandized him, and ended the interview because Lucas asked for an attorney. *Id*. Approximately four hours later, FBI agents went to the police station, mirandized Lucas, and interviewed him about an unrelated offense after he waived his rights. *Id*. at 244-45. He signed a full confession. *Id*. at 245. From the time Lucas requested a lawyer until the time he was booked by the FBI, he was not provided access to counsel. *Id*. The Ninth Circuit held that Lucas' Fifth Amendment rights were violated when he was interrogated after requesting counsel even though (1) the second interrogation involved a different offense, (2) by a different law enforcement agency, (3) Lucas was mirandized prior to the second interrogation, and (4) his confession to the FBI may have been voluntary. *Id* at 247. Lucas did not initiate the contact, and

under *Robertson*, "his unhonored request for counsel vitiates his subsequent decision to talk without counsel's presence." *Id*.

In this case, Detective Smith was not at the Stratosphere Hotel or present at the time of Stokes' initial arrest. His first contact with Stokes was at the DEA office where he took custody of Stokes to transport him to the Henderson Detention Center. Stokes' uncontradicted testimony is that when he learned he was in serious trouble, he stated he needed a lawyer and was told "we'll get to that." Thus, even though Special Agent Smith may not have been aware that Stokes had asked for counsel, *Edwards'* rigid and prophylactic rule bars admission of Stokes' statements.

### III.   Conclusion.

Stokes hotel room and cell phones were searched pursuant to valid search warrants. Although the court found Stokes credible that members of the DEA team who arrested him scrolled through his iPhone and accessed its contents, suppression is not required. It is undisputed that members of the DEA team who arrested Stokes briefly entered his hotel room without a warrant to remove any occupant, freeze the premises awaiting a search warrant and to allow Hardy to retrieve his belongings. Officers may enter the premises of a person arrested on probable cause to remove any occupants and maintain the status quo while waiting for a search warrant. The second entry to allow Hardy to retrieve his belongings lasted less than four minutes and nothing that was seen or discovered in the entry was used to obtain the search warrant. In *Segura* and *Murray* the Supreme Court held that where, as here, police obtain a valid search warrant that is not tainted by a prior unlawful search, evidence recovered in the search need not be suppressed.

The court found Stokes credible that shortly after his initial arrest when he was told he was in bigger trouble than a probation violation he told officers he needed a lawyer and was told "we'll get to that". The court also found Special Agent Smith credible that he advised Stokes of his Miranda rights and Stokes initially agreed to talk before stating he wanted a lawyer. However, the Supreme Court's holding in *Edwards* and its progeny dictate suppression of Stokes' statements.

For all of these reasons,

**IT IS RECOMMENDED** that Stokes' Motion to Suppress (Dkt. #62) be **GRANTED in part** and **DENIED in part** as follows:

1. The motion should be **DENIED** with respect to evidence recovered from Stokes' hotel room pursuant to a valid search warrant;

2. The motion should be **DENIED** with respect to the contents of the cell phone(s) analyzed by DEA Agent McGowan;

3. The motion should be **GRANTED** with respect to Stokes' statements.

DATED this 18th day of September, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE